RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0140p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

HEIDI HOSTETTLER,

　　　　　　　*Plaintiff-Appellant*,

*v.*

THE COLLEGE OF WOOSTER,

　　　　　　　*Defendant-Appellee*.

No. 17-3406

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:15-cv-01601—John R. Adams, District Judge.

Argued: March 9, 2018

Decided and Filed: July 17, 2018

Before: DAUGHTREY, GIBBONS, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Daniel P. Petrov, THORMAN PETROV GROUP CO., LPA, Cleveland, Ohio, for Appellant. Peggy J. Schmitz, CRITCHFIELD, CRITCHFIELD & JOHNSTON, LTD., Wooster, Ohio, for Appellee. **ON BRIEF:** Daniel P. Petrov, Lara S. Nochomovitz, THORMAN PETROV GROUP CO., LPA, Cleveland, Ohio, for Appellant. Peggy J. Schmitz, Kimberly L. Hall, CRITCHFIELD, CRITCHFIELD & JOHNSTON, LTD., Wooster, Ohio, for Appellee.

_____

## OPINION

_____

　　MARTHA CRAIG DAUGHTREY, Circuit Judge. Heidi Hostettler was fired from the College of Wooster's Human Resources Department when she was unable to return to work on a

full-time basis as she was recovering from postpartum depression and separation anxiety. She sued under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213 (2012); Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17; the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601–2654; and Chapter 4112 of the Ohio Revised Code.[1] The district court granted summary judgment to Wooster on all claims. The lynchpin of the district court's decision was its conclusion that Hostettler did not make out a *prima facie* case under the ADA because she could not meet an essential function of the position—full-time work—and so was not otherwise qualified for the job. Because genuine disputes of material fact remain, we reverse the judgment of the district court and remand for trial.

## BACKGROUND

**Background of the ADA**

Nearly one in every five Americans has a disability. MATTHEW W. BRAULT, U.S. CENSUS BUREAU, AMERICANS WITH DISABILITIES: 2010 4 (2012). Yet at the time of the last census report, a mere 41% of people with disabilities between the ages of 21 and 64 were employed. *Id.* Although "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society," 42 U.S.C. § 12101(a)(1), these numbers reflect the harsh reality that "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged . . . economically," *id.* § 12101(a)(6).

Congress passed the Americans with Disabilities Act in 1990 to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(8) (pre-2008 amendments). To that end, the law broadly prohibits "discriminat[ion] against a qualified individual on the basis of disability" as it applies to aspects of employment including hiring, advancement, and firing. 42 U.S.C. § 12112(a).

---

[1]Chapter 4112 of the Ohio Revised Code prohibits, among other things, discrimination on the basis of sex and disability. Because that statute's prohibitions mirror those of the ADA and Title VII, the state-law claims rise or fall on the resolution of the federal claims. Thus, we do not address the state-law claims individually. *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016) (analyzing Chapter 4112 under Title VII); *Rorrer v. City of Stow*, 743 F.3d 1025, 1031 n.1 (6th Cir. 2014) (analyzing Chapter 4112 under the ADA).

But years of court decisions narrowly defining who qualifies as an individual with disabilities left the ADA too compromised to achieve its purpose. In response, Congress passed the ADA Amendments Act of 2008 (ADAAA) to invalidate those decisions and to "restore the intent and protections of the Americans with Disabilities Act." Pub. L. No. 110–325, 122 Stat. 3553. In passing the ADAAA, Congress reasserted its goal of "provid[ing] clear, strong, consistent, enforceable standards" to implement a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1), (2). It is against that background that this case must be viewed.

**Factual and Procedural Background**

Heidi Hostettler was hired as an HR Generalist by the College of Wooster in late summer 2013. At the time that she was interviewed and took the position, she was four-months pregnant. Throughout the hiring process, Hostettler was open about her pregnancy. And during negotiations, when Hostettler and Wooster's HR team discussed leave, Hostettler was told that they would be willing to accommodate her pregnancy. Wooster's official policy was to allow new employees 12 weeks unpaid maternity leave under the FMLA, even if they did not otherwise qualify for leave under the law.

For the first five months—before her maternity leave—Hostettler's employment seemed to be a mutually beneficial arrangement. As an HR Generalist, Hostettler helped managers with employee relations, including performance-improvement plans; participated in recruiting new hires for the college; and designed training programs, among other duties. She worked full-time, regularly from 8:00 a.m. to 5:00 p.m., but sometimes until 6:00 p.m. And when necessary, she organized trainings or answered email and phone calls in the evenings and on the weekends. Although Hostettler was working more than 40 hours per week, she contends that the job required "probably thirty, thirty-five" hours a week. She explained that in the extra time she sought out more work so that she could have something to do.

Hostettler started her maternity leave at the beginning of February and took her full 12 weeks. She was slated to return to work at the end of April. But as the time to return to work approached, Hostettler experienced severe postpartum depression and separation anxiety.

Hostettler's OB/GYN, Dr. David Seals, testified that "she had one of the worst cases of separation anxiety" that he had ever seen. Seals explained that she did not seem like herself and that she cried during almost every appointment with him. He prescribed her an antidepressant.

Seals also thought that it would be a bad idea for Hostettler to return to work right away, and testified that he believed that "it was medically necessary that [Hostettler] could work a reduced schedule." He suggested that she return to work on a part-time basis for the "foreseeable future." He thought that Hostettler would be able to return to work on a full-time basis in "a month or two," and that the symptoms of postpartum depression and separation anxiety rarely last longer than six months.

Concerned that she could not return to work, Hostettler met with her direct supervisor, Marcia Beasley, and explained how she was doing and that she would need more time before coming back. According to Hostettler, Beasley was "sympathetic and understood." And so Hostettler did not return to work at the end of April.

In the beginning of May, Seals submitted to Wooster an Intent to Return to Work Form (under the FMLA), stating that Hostettler needed to work a reduced schedule of three days a week but put no restrictions on her work activities. When Hostettler returned to work, Beasley recommended that instead of working two or three full days a week, Hostettler work five half days a week. Seals submitted an addendum to his certification, advising five half-time days a week. In response, Wooster informed Hostettler that it would accommodate her part-time schedule until June 30, at which time she should submit an updated certification from her doctor. Hostettler returned to work in late May, having been on leave longer than the originally agreed 12 weeks.

The parties disagree over what happened during the following two months. Hostettler continued to suffer from depression and anxiety. And if she had to work much later than noon— her modified stop time—she would have panic attacks, during which she would have difficulty breathing, thinking, and even walking. But with an accommodated schedule, Hostettler contends that she was able to do everything required of her position. She stated that she responded to all employee-relations issues, organized required trainings, and handled recruiting matters. And if

an issue arose when she was out of the office, she either would handle it by answering emails in the evening or Beasley would ask her to address it the next morning. When another HR employee went on maternity leave, Hostettler contends that she did not "feel[] the pinch" of the department being down another employee. Nor was Hostettler aware of any problems in the department, in part because Beasley never mentioned any in their conversations.

One of Hostettler's colleagues, Natalie Richardson, agreed with Hostettler's assessment of her work situation. In a declaration, Richardson explained that she believed that Hostettler could do much of her work from home—a common practice in the department—and knew that Hostettler was in fact replying to work emails in the evenings when on her modified schedule. Richardson also explained that during Hostettler's modified schedule, she was not aware of any "employee relations, recruiting, or training issues, programs, or assignments that Ms. Hostettler failed to complete." And more broadly, Richardson was "unaware of any human resources issue, program, or assignment of any kind that the Department failed to complete professionally and timely during the same period."

Apparently, Beasley agreed with much of what Hostettler and Richardson concluded—she testified that Hostettler "related to employees well and she could work through issues with employees and she seemed to be quick to identify solutions." Throughout Hostettler's time at Wooster, there had been no complaints about her work or conduct. Beasley stated that Hostettler never failed to perform any responsibility or finish any assignment in a timely manner. And her first evaluation, done in June or July of 2014—shortly before Hostettler was fired—contained no negative feedback but instead concluded that "Heidi is a great colleague and a welcome addition to the HR team!"

At the same time, however, Beasley felt that Hostettler's modified schedule put a strain on Beasley and the rest of the department. She testified that during that time, Hostettler did not perform critical functions of her job, such as filling job openings, and leading trainings and lunch programs. As a result, Beasley was "just running from one thing to another to get things done" and was "really overwhelmed and left without anyone in the office to help with responsibilities and tasks that came up." She also contended that work in the department was left unfinished or ignored. And Beasley was concerned that an upcoming online benefits project would leave the

HR team even more short-staffed. But when pressed to identify any specific responsibilities or assignments that were not completed, Beasley repeatedly was unable to name any.

June 30 passed without Hostettler submitting a new certification from her doctor. During the first two weeks of July, Beasley had four conversations with Hostettler about her employment. According to Wooster, "[d]uring these meetings, Ms. Beasley emphasized to Hostettler that she needed to be back at work full-time." But the only support that Wooster gives for that factual assertion is a citation to Hostettler's deposition in which she explicitly said that Beasley told her only once that she was needed full-time.

Hostettler, on the other hand, testified that those four meetings did not go as Wooster argues. First, she testified that one of those four meetings was her review, in which she received positive feedback from Beasley and no mention was made that a return to full-time work was required. Hostettler also explained that during those first two weeks of July, she continued to speak with Beasley, keeping her informed of her medical status and ability to work. Hostettler wanted to find a way to return to work full-time, and even suggested that she extend her hours past noon to 2:00 or 3:00 p.m. She contends that Beasley was uninterested in finding a solution and that it was a "one-way conversation."

At the conclusion of the first two weeks of July, Seals submitted an updated medical certification, in which he explained that Hostettler should continue to work half-time and estimated that she might return to full-time employment at the beginning of September. Hostettler contends, however, that on the day after Seals submitted the medical certification, she followed up with Beasley, asking again about extending her hours from 8:00 a.m. to 2:00 p.m. Beasley never responded.

The next day, Beasley fired Hostettler. Beasley sent her a letter, stating that because her updated medical certification required her to work half-time, she was "unable to return to [her] assigned position of HR Generalist in a full time capacity" and was being terminated. A few weeks later, Beasley hired a temporary clerical employee to handle some of the administrative work in the department. But that employee did not do any of the tasks that the department required an HR Generalist to complete. As a result, Hostettler's firing left the department with

fewer resources for employee relations, training, and hiring.  It was not until October of that year that Wooster hired Hostettler's replacement—a man.

Hostettler sued Wooster, claiming violations of the ADA, the FMLA, Title VII's prohibition against sex discrimination, and corresponding Ohio state laws.  Wooster moved for summary judgment on all claims and Hostettler moved for partial summary judgment on her ADA claim.  The district court denied Hostettler's motion and granted Wooster's motion on all of Hostettler's claims.

The district court's decision largely rested on one legal conclusion—that full-time work was an essential function of the position of HR Generalist.  The court first analyzed Hostettler's ADA claim, concluding that, as a matter of law, full-time work was essential to Hostettler's position.  And because Hostettler could not satisfy that essential function or propose a reasonable accommodation that would allow her to meet the essential function, she was not a qualified individual under the ADA.  The court also concluded that Wooster engaged in the interactive process required by the ADA when Beasley met with Hostettler and told her that she was needed on a full-time basis.

The court's conclusions under the ADA supported most of its remaining analysis. Evaluating Hostettler's Title VII claim under the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the district court assumed that Hostettler made out a *prima facie* case.  The district court then concluded that Wooster had articulated a legitimate, nondiscriminatory reason for firing her—that Hostettler could not work full-time and thus could not meet an essential function of the position.  And because Hostettler could not demonstrate the proffered rationale was pretext for discrimination, her Title VII claim failed.  Turning to Hostettler's FMLA claims, the district court first held that Wooster did not interfere with any of Hostettler's rights under the FMLA because she was not legally entitled to any additional leave. Finally, the district court concluded that Hostettler's FMLA retaliation claim, like her Title VII claim, should be analyzed under the *McDonnell Douglas* framework.  Thus, the court held, because Hostettler's Title VII claim failed, so too did her FMLA retaliation claim and corresponding state claims.

**DISCUSSION**

**Standard of Review**

We review a grant of summary judgment *de novo*. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). "In doing so, we draw all reasonable inferences and view the evidence in the light most favorable to the [nonmovant]" to determine whether there is a genuine dispute of material fact. *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022 (6th Cir. 2013). That means that, in most cases, evidence offered by the nonmovant must be accepted as true and that credibility judgments and weighing of the evidence are improper. *Rorrer*, 743 F.3d at 1038. A genuine dispute of material fact exists if a reasonable jury—viewing the evidence in favor of the nonmovant—could decide for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And where there is a genuine dispute of any material fact, summary judgment is inappropriate. *Henschel*, 737 F.3d at 1022.

**The Americans with Disabilities Act**

The ADA forbids "discriminat[ion] against a qualified individual on the basis of disability" as it applies to hiring and firing. 42 U.S.C. § 12112(a). Prohibited discrimination also includes "not making reasonable accommodations," *id.* § 12112(b)(5)(A), such as "part-time or modified work schedules," 29 C.F.R. § 1630.2(o)(2)(ii) (2012). There are two ways that a litigant can prove discrimination—directly or indirectly—each with its own test. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016). "Distinguishing between cases that involve direct evidence of discrimination and those in which the plaintiff is not able to introduce direct evidence is vital because the framework for analyzing the two kinds of cases differs." *Id.* at 892 (quoting *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) (*abrogated by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (*en banc*)).

Under the direct method of proof the plaintiff must show (1) that she is an individual with a disability, and (2) that she is otherwise qualified for her job despite the disability "(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Ferrari*, 826 F.3d at 891 (quoting *Monette*,

90 F.3d at 1186). The indirect test, on the other hand, applies the burden-shifting approach of *McDonnell Douglas*. *Id.* at 891–92.

Hostettler argues that the direct test applies in this case, and Wooster concludes that the indirect test is proper. But neither party cites to any cases that support their respective positions or provides more than a conclusory analysis. The district court's opinion is equally conclusory—it assumes that the indirect test applies without analyzing the applicability of the direct test. We are convinced, however, that the direct test is the correct approach when an employer rescinds a reasonable accommodation.

Claims that allege a failure to accommodate "necessarily involve direct evidence." *Kleiber*, 485 F.3d at 868. Inversely, then, termination for no reason other than alleged problems with an already-in-place accommodation should involve the same direct standard of proof. That squares with our settled law because it "does not require the fact finder to draw any inferences," *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 916 (6th Cir. 2013), that the disability was at least a motivating factor.

No inferences are required in this case. Beasley admitted that Hostettler was fired solely because the college determined that it no longer could accommodate her modified schedule. Indeed, when Beasley was asked whether, by referring to Hostettler's inability to work full-time, she was "pointing to [Hostettler's] need for a modified work schedule . . . and no other reason," Beasley readily agreed. Furthermore, although Wooster argues in favor of the indirect test, it applies the direct test in its brief. Because the resolution of the case revolves around the questions of the direct test, we apply it here.

**Individual with a disability**

In the first step of the direct test, a plaintiff alleging an ADA violation must establish that she is an individual with a disability. The district court skipped this step, however, presumably because it presumed that Hostettler satisfied the definition of an individual with a disability. Nevertheless, Wooster devotes almost 17 pages of its brief arguing that Hostettler's mix of postpartum depression and separation anxiety is not a disability, forcing us to address that issue.

Under the post-2008 ADA law, Hostettler plainly is an individual with a disability. In keeping with the remedial purposes of the ADAAA, "[t]he definition of disability" under the ADA "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). That is because the primary concern of the ADA is "whether covered entities have complied with their obligations and whether discrimination has occurred," not whether an individual's impairment is a disability. 29 C.F.R. § 1630.2(j)(1)(iii).

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Major life activities include, but are not limited to, sleeping, caring for oneself, speaking, breathing, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A). And "the term 'major' shall not be interpreted strictly to create a demanding standard." 29 C.F.R. § 1630.2(i)(2).

To determine whether a disability substantially limits major life activities, the regulations direct courts to compare the person claiming a disability to "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment need not prevent, or significantly or severely restrict . . . a major life activity" to be substantially limiting. *Id.* Like the term "major life activities," "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i).

Wooster argues that Hostettler cannot satisfy even this lenient standard. Specifically, Wooster argues that Hostettler's symptoms are "uncorroborated" and "self-described"; that her doctor's testimony generally described a person with separation anxiety, not Hostettler specifically; that because panic attacks last only several minutes, they do not substantially limit any major life activity; and that rather than needing a limited schedule, Hostettler simply wanted to work half days for the summer.

In support of its argument, Wooster ignores or mischaracterizes record evidence. Certainly, there is no shortage of record evidence supporting Hostettler's argument that she is an individual with a disability under the ADA. For example, Hostettler's OB/GYN, Dr. Seals, believed that Hostettler "had one of the worst cases of separation anxiety" that he had ever seen. She cried almost every time that she was in his office, did not seem like herself, and required

prescription antidepressants. Her former coworker, Natalie Richardson, stated that Hostettler's conditions "limited her physically, mentally, and emotionally" and "caused her to suffer from panic attacks, difficulty breathing, and limited ability to communicate, focus, and make decisions."

And despite what Wooster argues, that these attacks were episodic makes no difference under the ADA. So long as the impairment "would substantially limit a major life activity when active," that is enough. 42 U.S.C. § 12102(4)(D). Wooster does not dispute that when Hostettler was experiencing her depression and anxiety she was substantially limited in her ability to care for herself, sleep, walk, or speak, among others. *See id.* § 12102(2). That is enough for her to be considered an individual with a disability under the ADA.

**Otherwise qualified**

The crux of this case is whether Hostettler was otherwise qualified for her position. The district court concluded that as a matter of law she was not. But both parties have presented sufficient evidence to raise genuine disputes of material fact that preclude summary judgment.

To show that she is otherwise qualified for a position—and thus meet her *prima facie* burden—an employee must show that she can perform the essential functions of a job with or without an accommodation. "A job function is essential if its removal would fundamentally alter the position." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018) (quoting *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001)). Put another way, essential functions are the core job duties, not the marginal ones. 29 C.F.R. § 1630.2 (n)(1).

This analysis does not lend itself to categorical rules—it is "highly fact specific." *Mosby-Meachem*, 883 F.3d at 605 (quoting *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000)). Although this court has stated that "[r]egular, in-person attendance is an essential function" of most jobs, *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015) (en banc), it is not unconditionally so; courts must perform a fact-intensive analysis. In determining what functions are essential, courts may consider as evidence—among other things—the amount of time spent on a particular function; the employer's judgment; "written job

descriptions prepared before advertising or interviewing" for the position; and the consequences of not requiring the employee to perform the particular function. 29 C.F.R. § 1630.2(n)(3). Although the employer's judgment receives some weight in this analysis, *see Williams v. AT&T Mobility Servs.*, 847 F.3d 384, 391–92 (6th Cir. 2017), it is not the end-all—*especially* when an employee puts forth competing evidence. *See id.* at 393. After all, the burden of making out a *prima facie* case is not an onerous one. *See, e.g.*, *Ferrari*, 826 F.3d at 894.

Hostettler presented evidence that she satisfied all the core tasks of her position. She testified that she completed all her work on time, including training, employee relations, and recruiting. She also submitted the affidavit of her former colleague, Natalie Richardson, who confirmed Hostettler's evaluation of her effectiveness on a half-schedule. Richardson even went so far as to say that it was not just Hostettler's work that was being done in a timely manner— she was "unaware of *any* human resources issue, program, or assignment *of any kind* that the Department failed to complete professionally and timely during the same period." (Emphasis added.)

What is more, statements by Wooster's representative (and the person who fired Hostettler), Marcia Beasley, support Hostettler's conclusion. Beasley gave Hostettler her employee review while Hostettler was working a part-time schedule. The review did not mention that Hostettler was needed on a full-time basis. Instead, it was very positive, praising Hostettler's work. Beasley wrote that Hostettler "willingly accept[ed] assignments" and that she was "responsive" and "unafraid to take the difficult situations." And during her deposition, Beasley explained that Hostettler never had failed to complete a task or meet a responsibility in a timely manner. Although Beasley contended that there were tasks that were not being completed, she was unable to name any specifically. In the end, Hostettler never received a performance improvement plan, discipline, written criticism, or even a single complaint about her work.

In many circumstances, that much evidence might be sufficient to grant summary judgment in an employee's favor. But here the record does contain some evidence that Hostettler was not completing all of her work during her part-time schedule. Beasley stated that she was overwhelmed as the only one in the office to handle employees who showed up

unexpectedly to talk about an issue. And because there was no one in the office to help with the issues Beasley faced, some event-planning responsibilities "dropped through the cracks." Beasley further explained that Hostettler's absence was putting a strain on the department. The six-person department recently was down another employee on maternity leave. And two of the remaining employees were beginning an online benefits project in July, which would take up a significant amount of their time.

Given the competing evidence, summary judgment was improper. The district court, however, ignored some of the disputes in the record and resolved others in Wooster's favor. For example, the district court's opinion implies that because Hostettler did not return to work until more than three weeks after her initial leave term expired, she left the department in a poor position. But the district court fails to mention that it is uncontested that Hostettler had explained to Beasley—before the leave expired—that she needed extra time before returning, and that Beasley accommodated Hostettler's needs. And despite the extensive evidence in the record that the HR department was running relatively smoothly while Hostettler worked a part-time schedule, the district court concluded that the department "was already struggling" and that it "would have become even more difficult" as the department implemented its online benefits program.

Based on its resolutions of the factual disputes against Hostettler, the district court then concluded that, as a matter of law, working full time was an essential function of the position. The district court relied on the listing of the position as full time, the fact that Hostettler previously worked 40 hours a week, and evidence that Beasley told Hostettler that she wanted her to work a full-time schedule.

On its own, however, full-time presence at work is not an essential function. An employer must tie time-and-presence requirements to some other job requirement. To be sure, Wooster cites language from this court's cases that, when viewed independently from the facts of the cases, supports the college's position. But those cases nevertheless carried out a fact-intensive analysis of actual job requirements.

In *Ford*, for example, the plaintiff requested up to four days a week away from the office. 782 F.3d at 759.  The court concluded that predictable and regular presence was an essential function of the job, as it is of many jobs.  *Id.* at 762.  But that decision did not rely on a broad rule that presence is required.  There, Ford's evidence showed not only what specific aspects of the plaintiff's job generally could not be done remotely, but how the plaintiff had in fact failed to complete her work in previous telework situations.  *Id.* at 759–60.  Similarly, in *Williams*, the court held that physical presence was an essential function of a job in a call center because the employees had to be physically present to answer the phone calls—it was impossible to do the work from home.  847 F.3d at 387–88, 392.  If the employee was not there when a call came in, the call simply went to another employee to field.  *Id.* at 388.  In addition, AT&T submitted evidence that it had a strict attendance policy because without it there were concrete effects, namely that customers had to wait longer and were displeased.  *Id.*

Following these cases, Wooster must explain *why* Hostettler could not complete the essential functions of her job unless she was present 40 hours a week.  But Wooster cannot make that required showing:  as explained above, there remain disputes of material fact over whether Hostettler was able to achieve all of her job's essential functions on a modified schedule.  For that reason, this case presents a situation similar to that addressed in *Mosby-Meachem*.**2**  There, an employer refused to let an employee work remotely and argued that remote work was *per se* unreasonable because it did not allow the employee to complete essential functions of her job. *Mosby-Meachem*, 883 F.3d at 603.  Although the employer pointed to evidence that some essential functions inherently required in-person work, we found evidence that the plaintiff could complete all of her essential functions working remotely for ten weeks.  Those factual disputes precluded judgment as a matter of law.  *Id.* at 603–04.  So, too, here.**3**

---

**2**Although *Mosby-Meachem* involved a jury trial, its analysis applies to this summary-judgment case because the court was required to determine—as a matter of law—whether there was "sufficient evidence supporting" the jury's conclusion on material facts.  883 F.3d at 604.  And much like a summary-judgment motion, the court had to view the evidence in a light favorable to the nonmovant and otherwise could not weigh the evidence or draw factual conclusions.  *Id.* at 602.

**3**Beyond presenting evidence that while she worked part time, everything was getting done, Hostettler even sought to increase her hours before returning to a full-time schedule the following month.  She never claimed, nor do we hold, that she had a right to perform her job on a part-time basis indefinitely.  If she had, we might be reviewing a closer case; one in which Wooster at least would have had the opportunity to show that such an accommodation

In sum, full-time presence at work is not an essential function of a job simply because an employer says that it is. If it were otherwise, employers could refuse *any* accommodation that left an employee at work for fewer than 40 hours per week. That could mean denying leave for doctor's appointments, dialysis, therapy, or anything else that requires time away from work. Aside from being antithetical to the purpose of the ADA, it also would allow employers to negate the regulation that reasonable accommodations include leave or telework. 29 C.F.R. § 1630.2(o)(2)(ii).

Wooster may have preferred that Hostettler be in the office 40 hours a week. And it may have been more efficient and easier on the department if she were. But those are not the concerns of the ADA: Congress decided that the benefits of gainful employment for individuals with disabilities—dignity, financial independence, and self-sufficiency, among others—outweigh simple calculations of ease or efficiency. To that end, the ADA requires that employers reasonably accommodate employees with disabilities, including allowing modified work schedules. An employer cannot deny a modified work schedule as unreasonable unless the employer can show *why* the employee is needed on a full-time schedule; merely stating that anything less than full-time employment is *per se* unreasonable will not relieve an employer of its ADA responsibilities.

**Failure to engage in interactive process**

Once an employee requests an accommodation, the employer has a duty to engage in an interactive process. Specifically, the employer must "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Mosby-Meachem*, 883 F.3d at 605–06 (citations omitted). Employers must engage in a "good faith" process and an "individualized inquiry" to determine whether a reasonable accommodation can be made. *Rorrer*, 743 F.3d at 1045 (citations omitted).

---

was unreasonable. *Ferrari*, 826 F.3d at 891 (quoting *Monette*, 90 F.3d at 1186). But that is not the case here. Here, Hostettler introduced sufficient evidence to create a dispute of fact over whether her moderate, time-limited accommodation allowed her to perform the essential functions of her position.

The district court ruled that Wooster satisfied this requirement because Beasley met with Hostettler four times in early July, and they discussed Hostettler's employment and the needs of both parties. The district court concluded that although the parties met and discussed accommodations, Hostettler was unwilling to accept anything less than her part-time schedule and "[t]he law does not require that the parties meet and that the employer concede to the employee's request."

But that conclusion is wrong for the same reason that the rest of the district court's ADA analysis is incorrect—it decides between competing facts, thus misapplying the summary-judgment standard. It is undisputed that Beasley and Hostettler met four times in early July. But what is unclear is what was discussed in those meetings. Wooster states that "Beasley discussed with Hostettler her concerns regarding Hostettler's failure to work full-time on at least four occasions." Yet the record does not support that claim. In fact, the record shows that Beasley told Hostettler that she needed to return to full-time work during only one of those meetings.

For her part, Hostettler contends that she suggested extending her working hours past noon as a way of moving back to full-time work but that Beasley ignored the suggestion. Wooster does not mention this contention in its brief. Nor did the district court address it in its order. In short, there is competing record evidence that makes it unclear whether, or how, Wooster was willing to engage in the interactive process. For this reason also, summary judgment was improper.

**Title VII Sex/Pregnancy Discrimination Claim**

The grant of summary judgment to Wooster on Hostettler's Title VII sex/pregnancy claim also was improper. Applying the *McDonnell Douglas* burden-shifting approach, the district court assumed that Hostettler satisfied her *prima facie* burden. But relying on its determination under the ADA that Hostettler could not satisfy an essential function of her job, the district court concluded that Wooster had a legitimate, nondiscriminatory reason to fire her. And, the court added, because Hostettler neither argued pretext nor pointed to any evidence that would support a finding of pretext, she could not carry her burden.

But, in fact, Hostettler *did* argue that Wooster's decision was pretextual. "Plaintiffs may show that an employer's proffered reasons for an adverse employment action are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)).

Hostettler satisfied that burden. First, as described above, the district court wrongly concluded that full-time presence was an essential function of her position. Because there remain genuine disputes of material fact on that question, a jury could find that Wooster's proffered reason for firing Hostettler "ha[s] no basis in fact" or "did not actually motivate the action." *Demyanovich*, 747 F.3d at 431 (quoting *Seeger*, 681 F.3d at 285). Similarly, Hostettler pointed to two employees who received longer periods of medical leave for non-pregnancy conditions—one received 23 weeks of leave and another received 24 weeks of leave. That those employees were not fired is a circumstance sufficient to create a dispute of fact over whether Wooster's proffered explanation was insufficient to justify firing Hostettler. *See id.*

As with Hostettler's ADA claims, there remain disputes of material fact on Hostettler's Title VII claim. Thus, summary judgment was inappropriate.

**FMLA Claims**

The district court also erred in granting Wooster summary judgment on Hostettler's FMLA claims. Wooster argued below—and continues to argue here—that Hostettler cannot raise any FMLA claims because she was never an eligible employee. Hostettler argues that because she was treated like an eligible employee, Wooster is equitably estopped from arguing that she was not. Instead of addressing how equitable estoppel affected Hostettler's FMLA eligibility, the district court assumed that Hostettler was FMLA eligible and addressed the merits of both of Hostettler's FMLA claims.

Although the district court assumed that Hostettler was eligible under the FMLA, it concluded that because she had been on leave for longer than the FMLA allowed, she was not entitled to additional leave. From this conclusion, the court reasoned that Wooster had not

interfered with any rights under the FMLA. The district court, however, failed to analyze whether equitable estoppel should foreclose that conclusion, too. We have recognized that equitable estoppel can prevent a defendant from challenging not only FMLA eligibility, but also entitlement to an FMLA benefit. *See Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 554-55, 557 (6th Cir. 2009) (holding that to prevail on an equitable estoppel argument, an flma plaintiff "need show only (1) a definite misrepresentation as to a material fact [e.g., that employer represented to employee that she was FMLA eligible], (2) a reasonable reliance on the misrepresentation, and (3) a resulting detriment to the party reasonably relying on the misrepresentation"). Hostettler has put forth evidence to show that throughout their communications, Wooster treated all of Hostettler's leave—even that beyond what was required by the statute—as FMLA eligible. Hostettler also presented evidence that she relied to her detriment on Wooster's misrepresentation that she was FMLA eligible. Wooster, on the other hand, argues that the record shows that Hostettler could not have believed that her leave was FMLA protected. Because this issue is fact-specific and was not addressed by the district court, "[t]he district court should resolve this issue in the first instance" on remand. *Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 336 (6th Cir. 2005). We thus remand on the FLMA claim.

Turning to Hostettler's FMLA retaliation claim, the district court reasoned that retaliation claims are analyzed under the *McDonnell Douglas* framework, the same as claims under Title VII. And because Hostettler's Title VII claim failed, so too must her FMLA retaliation claim. But as explained above, the district court's conclusion on Hostettler's Title VII claim was incorrect. For those reasons, the court's rejection of Hostettler's FMLA retaliation claim was also incorrect.

**CONCLUSION**

Application of the proper summary-judgment standard answers the questions raised in this appeal. Each party has presented evidence supporting its conclusion on each contested issue. But instead of holding that these contradictory facts precluded summary judgment, the district court weighed the evidence against Hostettler and decided in favor of Wooster as a matter of law. In doing so, the district court misapplied both the summary-judgment standard and our ADA precedents. Repeating that error, the district court decided that the conclusion on

Hostettler's ADA claim necessarily doomed her FMLA and Title VII sex/pregnancy claims as well. Because all of these errors involve improper factual determinations, we REVERSE the order of the district court and REMAND the matter for further proceedings consistent with this opinion.