NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0129n.06

No. 18-5029

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Mar 18, 2019
DEBORAH S. HUNT, Clerk

ADAM BOGART, )
)
    Plaintiff-Appellant, )    ON APPEAL FROM THE
) UNITED STATES DISTRICT
v. ) COURT FOR THE EASTERN
) DISTRICT OF KENTUCKY
UNIVERSITY OF KENTUCKY, )
)
    Defendant-Appellee. )

Before: KEITH, COOK, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. Adam Bogart, a former lab technician at the University of Kentucky, claims that the University violated the Kentucky Whistleblower Act and the Kentucky Civil Rights Act when it terminated him. According to Bogart, he was fired for telling his supervisor that statistical data she purchased from an outside company was seriously flawed. Bogart also alleges the University fired him because he has Tourette syndrome. The district court granted the University's motion to dismiss the Whistleblower Act claim after concluding that Bogart's complaint to his supervisor was not protected activity under that statute. The district court then granted summary judgment for the University on the disability discrimination claim because Bogart failed to make out a prima facie case of discrimination and, alternatively, failed to create a genuine issue of material fact regarding whether the University's asserted reason for firing him—his unsatisfactory performance—was pretextual. Bogart now appeals the district court's disposition of both claims. For the following reasons, we AFFIRM.

I.

Bogart suffers from Tourette syndrome "complicated by dystonia and mild cognitive impairment that is triggered by stress." His symptoms include slight incoordination, head shaking, eye blinking, and, occasionally, grunting. Bogart also experiences some symptoms of obsessive-compulsive disorder and a slightly below-average learning curve. He sees neurologists and psychiatrists to treat his condition, which is well-managed by medication. Even with medication, Bogart still shakes his head from left to right in a "no" motion approximately once every minute or two. Bogart earned a Ph.D. in behavioral neuroscience in 2010 from Kent State University, and then entered a year-long postdoctoral fellowship in radiology.

In December 2013, Bogart applied for a research position with Dr. Ai-Ling Lin, a researcher at the University of Kentucky. Originally from Taiwan, Lin received her Ph.D. in Radiological Sciences from the University of Texas Health Science Center at San Antonio. Her professional specialties include "risks for Alzheimer's disease[] and dietary effects on cognitive aging." After conducting an interview with Bogart at the University of Kentucky, Lin hired him as a senior laboratory technician, and he began work in June 2014, subject to a ninety-day probationary period.

Bogart's primary assignment was to conduct statistical analysis on a data set that Lin had purchased from an outside company, Metabolon, Inc. Lin spent $20,000 from a federal research grant to buy the Metabolon data. The data set contained the results of a study to determine how caloric restriction affects cognitive aging. Metabolon had performed tests on mouse brains and then performed preliminary analysis on the resulting data.

Reviewing the Metabolon data, Bogart noticed serious flaws: there were "a number of very significant outliers that could not be attributed to natural phenomena," with "data from certain

mouse brains . . . missing and unaccounted for." According to Bogart, the flaws[1] in the data meant that he "was never able to produce results to Dr. Lin's satisfaction." Bogart spoke with Lin about his concerns, but she allegedly refused to address the problem.

Around August 1, 2014, Lin called Bogart into her office and asked if he had Parkinson's disease—she had noticed that he shakes his head back and forth. Bogart replied that he did not have Parkinson's disease but did have lesions on his brain. Lin allegedly "became angry and questioned why [Bogart] had not told her about the lesion on [his] brain during [his] interview for the job." In an email sent later that day, Bogart elaborated on his condition and explained that he "ha[d] a slower learning curve than is usual for what you expect. But all of a sudden, I completely 'get' it—people are always fooled by my true abilities because of this." By email, Lin thanked him for explaining his condition and said that her concern was "not the speed of [Bogart's] learning curve, but the skills and professionalism [he] should already have after [his] Ph.D. training and so many years of experiences, e.g., the statistical analysis ability."

As Lin's email suggests, there had been "discord" between Lin and Bogart. Bogart says that, though Lin's English was "excellent," "[t]hroughout [his] employment," she would repeatedly ask him whether he could understand her English and would "say[] something to the effect of 'maybe I'm not getting through to you.'" Lin would also say that Bogart's "inability to complete the analysis was because she had 'set the bar too high' for [him], and that maybe [he] was incapable of doing 'this kind of work.'" Bogart claims that Lin would often become angry with him and raise her voice. For her part, Lin contends that "Bogart began to exhibit substandard

---

[1] The record suggests the Metabolon data was flawed. Following his termination, Bogart reported his concerns about the data to the U.S. Department of Health and Human Services' (DHHS) Office of Research Integrity, Division of Investigative Oversight. DHHS's resulting report largely confirmed Bogart's concerns with the data.

performance in late June[] 2014." Bogart's alleged deficiencies included forgetting to clock in and out at appropriate times; working more than forty hours per week after being instructed not to do so; failing to complete assignments; sleeping in the lab; chatting socially during work hours; and communicating with sales representatives in a capacity beyond his job description. Furthermore, on multiple occasions, Bogart mislabeled columns of data that he was analyzing and mistakenly "swapped numbers" between those columns. Lin says that these were "very serious" errors.[2] Lin also claims that Bogart frequently was rude and insubordinate toward her and spoke to her in a derogatory manner.

Bogart admits most of these allegations but tries to qualify or downplay his errors. He says that he never actually "swapped numbers" but only, "on a few occasions," reversed the headings on two columns of data, which, he says, were insignificant mistakes "commonly made when dealing with tremendous quantities of data." Similarly, Bogart admits he once chatted with an IT professional, but he claims he did so only while the professional was working on his computer. He says he "was never aware of any occasion" when he fell asleep in Lin's lab but was "informed of one occasion on which others say that [he] fell asleep."

The University's account of Bogart's misconduct was detailed in a written summary of an oral warning that Bogart received during an August 26 meeting with Lin and two University administrators. At this point, Bogart was still within his initial probationary period of employment. And after summarizing Bogart's inadequate performance and setting out required measures for improvement, the August 26 warning stated that "[f]ailure to improve and sustain improvement . . . may result in additional corrective action up to and possibly including termination of employment." At the meeting, Bogart tried to explain that the flaws in the

---

[2] Lin mentioned the gravity of these errors in her August 1 email reply to Bogart.

Metabolon data kept him from completing his assignments, but the administrators allegedly "cut [him] off," saying that they "didn't understand science." Bogart received a disability accommodation form during the meeting, but he never requested any accommodations.

Bogart claims that, on September 4, 2014, a University administrator told him that he was being fired because of "poor performance and some things [the administrator] heard from other people." Bogart says he then spoke to Lin, who told him she had "decided to terminate [him] some time ago."

For her part, Lin testified that Bogart showed no improvement following his oral warning and that, between August 26 and September 4, he "ignored specific instructions . . . and failed to complete tasks. . . . Additionally, Bogart was rude and insubordinate toward me by ignoring me when I spoke to him and speaking to me in a derogatory manner." She "met with Bogart and indicated that, because he had made no progress toward satisfactory job performance since [the] August 26 meeting, he was being separated from employment with the University." Disputing Lin's story, Bogart says that he did not ignore any instructions, fail to complete tasks, or behave rudely after the formal warning.

Immediately following his termination, Bogart submitted a complaint to the University's Office of Institutional Equity and Equal Opportunity (OIEEO) and alleged "wrongful termination due to discrimination (Tourette's Disorder)." OIEEO then sent Bogart a decision letter, stating that its investigation had concluded that neither his disability nor his concerns regarding the Metabolon data had anything to do with his termination.

Bogart filed this action in Kentucky state court in June 2016, naming the Board of Trustees of the University as the defendant and alleging violations of the Kentucky Whistleblower Protection Act, Ky. Rev. Stat. (KRS) § 61.101, *et seq.*, the Kentucky Civil Rights Act, KRS

§ 344.040, and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* The Board of Trustees removed the case to the United States District Court for the Eastern District of Kentucky. In federal court, the Board moved to dismiss the Whistleblower Act claim because it was not a proper defendant and because Bogart's complaint to his supervisor about her own misconduct did not constitute protected activity under Kentucky law. In response, Bogart amended his complaint and named the University as the defendant. The University filed a motion to dismiss the Whistleblower Act claim—again for failure to state a claim—and the district court granted the University's motion.

The University then moved for summary judgment on the discrimination claims, asserting that the ADA claim was barred by state sovereign immunity and the Kentucky discrimination claim failed because the University fired Bogart because of poor job performance, not his disability. The district court granted summary judgment to the University. Bogart timely appealed.[3]

II.

A.    Whistleblower Act Claim

Bogart first argues that the district court erred in dismissing his Whistleblower Act claim. We review de novo the disposition of a Rule 12(b)(6) motion to dismiss. *Jackson v. Prof'l Radiology Inc.*, 864 F.3d 463, 467 (6th Cir. 2017). In doing so, we construe the complaint in the light most favorable to the plaintiff, *id.*, and accept as true all well-pleaded factual allegations, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To survive a motion to dismiss, a complaint must

---

[3] Bogart has not appealed the dismissal of his ADA claim.

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Bogart claims the University violated the Kentucky Whistleblower Act by firing him after he told Lin about the flaws in the Metabolon data. The Whistleblower Act provides:

> No employer shall subject to reprisal . . . any employee who in good faith reports, discloses, divulges, or otherwise brings to the attention of [specified agencies and law enforcement] . . . or any other appropriate body or authority, any facts or information relative to an actual or suspected violation of any law, . . . any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

KRS § 61.102(1). A whistleblower plaintiff must allege four elements: (1) the employer is a state officer; (2) the plaintiff is a state employee; (3) the employee made or tried to make a good faith report or disclosure to an appropriate body or authority; and (4) the employer took or threatened to take action to discourage or punish the employee for making the disclosure or report. *Davidson v. Commonwealth, Dep't of Military Affairs*, 152 S.W.3d 247, 251 (Ky. Ct. App. 2004). The Kentucky Supreme Court has clarified that complaints to a supervisor regarding the supervisor's own misconduct are not disclosures protected by the Whistleblower Act. *See Pennyrile Allied Cmty. Servs., Inc. v. Rogers*, 459 S.W.3d 339, 346 (Ky. 2015).

The University, relying on *Pennyrile*, argued that Bogart failed to allege a protected disclosure because he merely complained to his supervisor about her own malfeasance. After allowing Bogart the opportunity to amend his complaint, the district court granted the University's second motion to dismiss. The district court relied heavily on *Pennyrile* and held that Bogart's claim fails "because he did not seek to disclose his supervisor's alleged misconduct—a decision to rely on data that was somehow fraudulent in conducting and reporting on research—to anyone other than his supervisor." Rather, his Whistleblower Act claim was "based solely on comments

and concerns related to Dr. Lin about her election to rely on certain data in conducting and reporting on research."

Bogart argues on appeal that the district court misconstrued the nature of his claim. That is, Bogart asserts that he was not just complaining about Lin's misconduct; he was "also complain[ing] to his boss about the misconduct of a third-party"—i.e., Metabolon. The University responds that the focus of Bogart's complaint has always been Lin's decision to rely on flawed data and Bogart forfeited his new argument by failing to raise it before the district court. We agree with the University.

This court has repeatedly "refused to review an argument that was not adequately presented in the district court." *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1398 (6th Cir. 1995). Contrary to Bogart's appellate focus on Metabolon's supposed fraud, the claim raised in the district court was, as the district court observed, "based solely on comments and concerns related to Dr. Lin about her election to rely on certain data in conducting and reporting on research." As such, Bogart cannot sidestep *Pennyrile*.

Bogart's district court filings confirm the impression that he based his Whistleblower Act claim on Lin's use of the flawed research data. To be sure, Bogart's Amended Complaint states that he "disclos[ed]" and "divulged" to Lin his "concerns . . . about the quality of the Metabolon report," and the complaint describes that report as "potentially fraudulent." But the Amended Complaint alleges that Bogart raised the issue because Lin "had the ultimate decision-making authority as to whether she should include the Metabolon data in her publication." In other words, Bogart disclosed the flaws in the Metabolon data to prevent Lin from committing research misconduct—misconduct for which he also could have been liable.

The Amended Complaint maintains this emphasis throughout: "[d]espite being aware of the flawed data, Dr. Lin directed Bogart to utilize i[t] anyway"; "Dr. Lin was so impatient to publish her paper that she was willing to incorporate inadequately analyzed and potentially fraudulent data"; "Bogart believed that such publication would be research misconduct"; "[s]ince Dr. Lin planned to make Bogart first author on the research paper, he feared that if anyone eventually found out that the statistics . . . were . . . fraudulent, he would be subject to criminal liability"; Bogart told Lin "that he felt that if the research paper was published and it was incorrect, he could be in a great deal of trouble."

Bogart's Response to the University's second motion to dismiss similarly directed the district court's attention to Lin's potential research misconduct, not to Metabolon's. There, Bogart doubled down on his allegations that he complained to Lin because she "possessed the ultimate authority as to the research subject and the publication of the paper" and that "[t]hough she was aware of the flawed data due to Bogart's disclosure, Dr. Lin directed Bogart to utilize it anyway."

Bogart also attached an exhibit to his Response—the DHHS report addressing Bogart's concerns. The DHHS report characterizes Bogart's complaint as "an allegation of possible research misconduct" against Lin. According to the report, Bogart "claimed that Dr. Lin was so impatient to publish a paper that she was willing to incorporate inadequately analyzed data, which in Dr. Bogart's opinion verged on, if not actually reaching, a level of research misconduct." If the district court had been under any impression that Bogart's complaint concerned Metabolon's misconduct—rather than Lin's—the DHHS report would have quickly dispatched that notion.

Nowhere in Bogart's district court filings is there any suggestion that he was concerned about Metabolon's possible violation of the law or that he reported the flawed data so that Lin could report or remedy Metabolon's misconduct. Under *Pennyrile*, Whistleblower Act protection

does not apply where "the gravamen of the [plaintiff's] complaint was not *intended* as a report of information regarding alleged violations of law." 459 S.W.3d at 345 (citing *Boykins v. Hous. Auth. of Louisville*, 842 S.W.2d 527, 528 (Ky. 1992)). The "gravamen" of Bogart's alleged disclosure was a warning that Lin risked research misconduct by relying on inadequately analyzed data. Such a complaint about Lin's own conduct does not make Bogart a protected whistleblower under *Pennyrile*.

Moreover, a recent decision by the Kentucky Supreme Court, *Harper v. University of Louisville*, 559 S.W.3d 796 (Ky. 2018),[4] counsels against accepting Bogart's belated attempt to recharacterize his complaint. In *Harper*, the plaintiff discovered that her supervisor planned to pay an advertising agency $100,000 to develop a commercial for the University. *Id.* at 805. The plaintiff "had experience working with national advertising agencies" and knew that this agency was grossly overestimating the cost. *Id.* So the plaintiff complained to her supervisor that the supervisor's plan to spend that amount "would be wasteful of taxpayer dollars." *Id.* Applying the *Pennyrile* principle, the Kentucky Supreme Court refused to grant the plaintiff whistleblower protection because "[r]eporting suspected wasteful spending to the alleged wasteful spender does not expose any waste" and so does not constitute a protected disclosure. *Id.* at 806 (explaining that the plaintiff's supervisor, "as the manager of the project, was the 'suspected' wrongdoer").

There is an obvious analogy between Bogart's claim and the one rejected in *Harper*. Bogart, like the plaintiff in *Harper*, knew that a third party had provided his supervisor with a bad product—or, in *Harper*, an overpriced product. The plaintiff in each case warned a supervisor that using the product would constitute misconduct—here, research fraud; in *Harper*, government waste. Like the supervisor in *Harper*, Lin was "the manager of the project," and her refusal to

---

[4] *Harper* was decided after oral argument in this case.

listen to her subordinate's concern made her "the 'suspected' wrongdoer." *Harper*'s application of *Pennyrile* thus confirms the district court's conclusion that Bogart's complaint did not adequately allege protected activity under the Whistleblower Act.

In sum, the district court did not err in concluding that, under *Pennyrile*, Bogart failed to allege protected activity. We need not consider whether Bogart's newfound focus on Metabolon's misconduct could support a Whistleblower Act claim because Bogart did not adequately present such a claim in the district court. *See Grandview Raceway*, 46 F.3d at 1398. We, therefore, affirm the district court's dismissal.

B.      Disability Discrimination Claim

Bogart next challenges the district court's entry of summary judgment for the University on his disability discrimination claim. This court reviews a district court's grant of summary judgment de novo. *Maben v. Thelen*, 887 F.3d 252, 258 (6th Cir. 2018). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view the facts in the light most favorable to the non-moving party." *Mitchell v. Schlabach*, 864 F.3d 416, 418 (6th Cir. 2017).

The Kentucky Civil Rights Act (KCRA) makes it unlawful for an employer to discriminate against an individual "because the person is a qualified individual with a disability." KRS § 344.040(1)(a). Given the similarities between the ADA and the KCRA's prohibition of disability discrimination, Kentucky courts generally apply the KCRA's prohibition in line with federal ADA caselaw. *See, e.g.*, *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) ("The Kentucky Civil Rights Act was modeled after federal law, and our courts have interpreted the Kentucky Act consistently therewith.").

When, as here, a plaintiff lacks direct evidence of discrimination and relies on indirect evidence,[5] Kentucky courts apply the three-pronged burden-shifting framework articulated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Larison v. Home of the Innocents*, 551 S.W.3d 36, 41 (Ky. Ct. App. 2018) (applying the *McDonnell Douglas* burden-shifting framework to analyze a KCRA claim).

Under this framework, Bogart must first establish a prima facie case of disability discrimination by showing: (1) that he had a disability; (2) that he was otherwise qualified to perform his job, with or without reasonable accommodation; and (3) that he suffered an adverse employment decision because of his disability. *Murray v. E. Ky. Univ.*, 328 S.W.3d 679, 682 (Ky. Ct. App. 2009). As for the third element, the Sixth Circuit has held that a plaintiff must show only but-for causation, and Kentucky courts seem to have adopted this construction. *See Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (abrogating prior circuit precedent that plaintiff must show discharge was "solely" caused by disability); *Hammond v. Norton Healthcare, Inc.*, No. 2011–CA–000586–MR, 2012 WL 5039465, at *6 (Ky. Ct. App. Oct. 19, 2012) (remanding the case for reconsideration in accordance with the but-for standard required by *Lewis*).

If Bogart establishes a prima facie case of disability discrimination, "the burden shifts to the employer to articulate a 'legitimate nondiscriminatory reason' for the termination decision." *Williams v. Wal-Mart Stores, Inc.*, 184 S.W.3d 492, 497 (Ky. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). If the University succeeds in offering a

---

[5] Direct evidence of disability discrimination includes any acknowledgment by the defendant that it relied on the plaintiff's disability in making the employment decision; indirect evidence of disability discrimination includes any other evidence from which a jury could infer that the defendant did so. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 892 (6th Cir. 2016).

legitimate reason for firing the plaintiff, the burden shifts back to Bogart to produce "specific evidence that [the University's] reasons were a pretext for discrimination." *Brown v. Olameter Corp.*, No. 2017-CA-000760-MR, 2018 WL 3699769, at *3 (Ky. Ct. App. Aug. 3, 2018); *see id.* (explaining that the plaintiff must "produce specific evidence of pretext to avoid summary judgment" (quoting *Harker v. Fed. Land Bank of Louisville*, 679 S.W.2d 226, 230 (Ky. 1984))).

The district court granted summary judgment for two reasons: (1) Bogart failed to satisfy the third element of his prima facie case of disability discrimination—i.e., he did not produce evidence from which a jury could reasonably conclude that his disability was the but-for cause of his termination; and (2) Bogart failed to offer evidence from which a jury could reasonably infer that the University's legitimate nondiscriminatory reason for terminating Bogart—his poor performance—was pretextual. Assuming for purposes of this appeal that Bogart can establish a prima facie case of disability discrimination, we affirm the district court on the ground that Bogart has not created a genuine issue of material fact as to whether the University's nondiscriminatory reason for firing him was pretext for intentional discrimination.

There is substantial evidence supporting the University's stated reason for firing Bogart—his unsatisfactory performance. Plaintiffs often prove pretext by showing that the employer's grounds for termination have no basis in fact. *See Hostettler v. Coll. of Wooster*, 895 F.3d 844, 858 (6th Cir. 2018). But Bogart largely admits the University's allegations. He does not deny that he forgot to clock in and out at appropriate times, worked more than forty hours per week after being instructed not to do so, failed to complete assignments, and was found sleeping in the lab. Nor does he deny that he received the August 26 oral warning that his poor performance could result in termination.

Instead, Bogart tries to downplay his errors, explaining, for example, that while he may have swapped the headings on data columns—and did so "on a few occasions"—these errors were "relatively unimportant," and are "commonly made when dealing with tremendous quantities of data." In this way, he seems to argue that his mistakes occurred but were insufficient to justify his termination. *See id.* (explaining that a plaintiff can raise an inference of pretext by showing that the employer's stated rationale was insufficient to motivate the termination). But showing that misconduct was insufficient to justify termination generally requires "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Bogart has not pointed to any non-disabled employees—or any employees at all—who made similar mistakes but were treated differently.

Bogart also argues that he satisfied his burden to show pretext because he denies the University's contention that he failed to improve following the August 26 oral warning. Lin testified that between August 26 and Bogart's September 4 termination, he "ignored specific instructions," "failed to complete tasks," and "was rude and insubordinate." Bogart denies these allegations. But Bogart's mere rejection of Lin's account does not suffice to show pretext. He admits, after all, that when the University administrator informed him that he was being fired, the primary reason given was "poor performance." And he also admits that, because of the flaws in the Metabolon data, he "was never able to produce results to Dr. Lin's satisfaction"—even though

his ability to analyze the Metabolon data was the primary reason he was hired in the first place.[6]
In other words, though Bogart purports to challenge Lin's assertion that he did not improve
following the oral warning, he corroborates rather than refutes the University's allegation of "poor
performance."

Bogart's only evidence suggesting that his disability—rather than his performance—
motivated his termination is his assertion that Lin reacted negatively when he told her he had
lesions on his brain. *Cf. Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431
(6th Cir. 2014) (explaining that a plaintiff may establish pretext by showing that the employer's
stated reason did not actually motivate the adverse employment action). Lin allegedly "became
angry and questioned why [Bogart] had not told her about the lesion on [his] brain during [his]
interview for the job." Notably, the only evidence in the record corroborating this incident is the
August 1 email exchange, in which Lin thanked Bogart for explaining his condition and said that
her concern was "not the speed of [Bogart's] learning curve, but the skills and professionalism
[he] should already have after [his] Ph.D. training and so many years of experiences." Other than
the conversation Bogart alleges, nothing in the record suggests any connection between Bogart's
termination and his disability. Bogart repeatedly points to Lin's yelling and her demeaning
comments, yet he admits that Lin's behavior occurred "[t]hroughout [his] employment," not just
after she learned of his disability. A reasonable jury could not, therefore, infer that Lin's alleged

---

[6] The record does provide reason to believe that the Metabolon data was, in fact, flawed. The
DHHS report stated that Bogart was "absolutely correct that there [were] many problems with the
methods, statistics, and assumptions in the [Metabolon] report." The report also noted that Lin's
lack of biostatistics experience likely prevented her from understanding Bogart's concerns. These
circumstances might explain both Bogart's failure to produce the results Lin expected and the
parties' frustration with one another. But the question before us is whether Bogart's termination
was because of his disability, not whether it was in some other sense "fair." The record here
reveals no jury-submissible evidence that Bogart's disability was the cause of his termination.

harassment manifested animus because of his disability. In fact, the evidence—Lin's alleged mistreatment of Bogart *before* he disclosed his condition, her frustration with his inadequate work product *before* that disclosure, and his admitted misconduct *after* the disclosure—eclipses any causal connection between the August 1 conversation and Bogart's September 4 termination.[7]

In sum, Bogart has not met his burden of providing specific evidence from which a reasonable jury could conclude that the University's nondiscriminatory reason for firing him was a pretext for disability discrimination. *See Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (explaining that at the pretext stage a plaintiff bears the "burden of producing sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants intentionally discriminated against him" (quotation marks and alterations omitted)). At most, his August 1 exchange with Lin and his attempts to downplay his misconduct "created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148 (discussing pretext claim in the context of age discrimination). When this is the case, "an employer [is] entitled to judgment as a matter of law." *Id.* The district court did not err in granting summary judgment for the University.

* * *

For the reasons stated above, we AFFIRM the district court's judgment dismissing Bogart's Whistleblower Act claim, and we likewise AFFIRM the district court's summary judgment for the University on Bogart's disability discrimination claim.

---

[7] Bogart himself stated, in a post-termination email, that there was insufficient evidence that his disability caused his termination: "If Tourette Syndrome played any role in my firing, I have only minimal evidence of that. . . . [T]hey probably assume I will file harassment charges based on my disability. I would not—as the evidence of that is too slim."