RENDERED: AUGUST 5, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0662-MR

JAMES LEWIS ERWIN                                        APPELLANT

APPEAL FROM OLDHAM CIRCUIT COURT
v.          HONORABLE JERRY D. CROSBY, II, JUDGE
ACTION NO. 19-CI-00112

JUSTICE AND PUBLIC SAFETY CABINET                        APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, LAMBERT, AND McNEILL, JUDGES.

CETRULO, JUDGE: Appellant James Lewis Erwin ("Commissioner Erwin")

appeals from the Oldham Circuit Court's order granting summary judgment in

favor of Appellee Justice and Public Safety Cabinet ("the Cabinet") in

Commissioner Erwin's retaliation lawsuit. Finding no error, we affirm.

# I.     PRELIMINARY MATTER

Commissioner Erwin moved to strike the Cabinet's brief due to the inclusion of an exhibit not properly entered into the record. We deny the motion to strike, but have not considered the exhibit in question, Exhibit 10, in our analysis.

# II.     BACKGROUND

In 2007, Commissioner Erwin was hired as the Director of Operations of the Department of Corrections ("DOC"), the largest of the five departments within the Cabinet. In May 2017, Commissioner Erwin was appointed acting commissioner of the DOC; and, in May 2018, Commissioner Erwin was officially appointed to the position by Secretary of the Cabinet, John Tilley ("Secretary Tilley").

In August 2017, while Commissioner Erwin was the Acting Commissioner of the DOC, he learned that Andrew English, General Counsel for the Cabinet ("GC English"), was having Kentucky Correctional Industries ("KCI") employees deliver and install cabinetry to his personal residence. Commissioner Erwin addressed the matter with GC English directly and reported the possible waste and/or abuse of authority to the Deputy Secretary of the Cabinet, Jonathan Grate ("Deputy Grate").[1] Thereafter, a meeting took place with Commissioner Erwin, Secretary Tilley, and Deputy Grate, among others. Secretary Tilley ordered

---

[1] Hereinafter, the "KCI disclosure."

an investigation[2] which found that the Executive Director of KCI[3] violated policy by allowing deliveries to be made to personal residences and continued this practice after Commissioner Erwin explicitly told him to stop. According to the Cabinet, the investigation found that GC English was unaware that his actions – of purchasing the cabinetry and thereafter getting it delivered and installed – were a violation of state policy. Commissioner Erwin claims that GC English "was not punished in any way" except to be "counsel[ed]" by Secretary Tilley. Commissioner Erwin argues that due to this KCI disclosure, GC English exhibited continued antagonism towards him. Commissioner Erwin points to a contentious meeting approximately one year after the KCI investigation as an example of the continued animosity between himself and GC English.

In November and December 2018, the Internal Investigations Branch of the Cabinet ("IIB") investigated claims of sexual harassment at the DOC.[4] This particular investigation was a result of a complaint by one woman of sexual harassment allegedly perpetrated by two African American corrections officers

---

[2] This KCI investigation was performed by the Kentucky Department of Public Advocacy.

[3] Fred Siegelman, who was later terminated by Commissioner Erwin.

[4] Prior to this IIB investigation, the Cabinet points to two other allegations of misconduct by DOC employees: Michael Wilson, a corrections officer, and Ron Tyler of Probation and Parole. The Cabinet claims Commissioner Erwin and the DOC did not "address[] the misconduct appropriately" and the discipline, or the lack thereof, represented "[Commissioner] Erwin's failures of leadership." However, Wilson and Tyler are not the subject of the alleged disclosure before us.

("DOC officers").[5]  After the investigation was complete, Commissioner Erwin asserted that the IIB investigation was deficient[6] and stated that he "could not justify any disciplinary actions" of the two DOC officers accused of sexual harassment.

> Subsequently, the Cabinet stated that
>
> [b]ecause of [Commissioner] Erwin's concerns about the investigation and the Cabinet's concerns about the manner in which sexual harassment complaints were being handled, a meeting was scheduled for January 14, 2019.  At the meeting, [Commissioner] Erwin was uncompromising in his belief that the investigations were inadequate to support any discipline.  [Commissioner] Erwin was also adamant that moving the victim in these investigations could not be seen as retaliation, and that a stronger standard of proof was necessary to substantiate sexual harassment allegations than that was required by federal law.  While [Commissioner] Erwin mentioned the men's race, he freely admitted that his primary concern was that, as minority employees, they would have additional grounds on which to challenge the termination decision, and might "take advantage" of civil remedies[.]

(Footnotes omitted.)

---

[5] Michael Williams and John Grievous.

[6] Commissioner Erwin argues that the IIB report "contained inaccuracies, failed to cite to correct internal policies, and reflected a failure to thoroughly interview witnesses."  He also challenged the accuracy and the admission of a "memo of concern" included in the report by the investigator.

At this January 14 meeting, Commissioner Erwin argues that he brought forth his second protected disclosure[7] under the Kentucky Whistleblower Act ("KWA"), and this meeting is also the root of the alleged Kentucky Civil Rights Act ("KCRA") violation. At this meeting, the exchanges between GC English and Commissioner Erwin were "contentious." Commissioner Erwin argues that he was told not to document his concerns regarding the IIB investigations, and that GC English advised him – on the direction of Secretary Tilley – to fire the DOC officers.[8] The Cabinet disputes this contention, and points to deposition testimony from other attendees that Commissioner Erwin was not instructed to fire the officers. The Cabinet argues that the meeting "was scheduled to obtain [Commissioner] Erwin's recommendation regarding discipline, and all types of discipline were discussed." (Footnotes omitted.)

A subsequent meeting was held on January 28, 2019 with Commissioner Erwin, Secretary Tilley, and Deputy Grate. According to Commissioner Erwin, at that meeting he again raised his complaint regarding the alleged inadequate IIB investigation and his concerns involving racial issues. Again, Commissioner Erwin argues that he was told to fire the DOC officers. And

---

[7] Hereinafter, the "IIB disclosure."

[8] Commissioner Erwin also argued that the Caucasian investigator showed a racial bias against the African American DOC officers.

again, the Cabinet argues that "[Secretary Tilley] did not order [Commissioner] Erwin to fire them." The Cabinet points to a January 31 email from Brad Holajter[9] to Commissioner Erwin requesting the Commissioner's recommendation on disciplinary action for the DOC officers.

Subsequently, Commissioner Erwin met with GC English's replacement, Tom Kerr ("GC Kerr").[10] According to Commissioner Erwin, GC Kerr agreed with him about the investigation deficiencies and expressed those concerns to Deputy Grate. Commissioner Erwin "had hoped that [GC] Kerr could get the Cabinet to hold off on any discipline of [the DCO officers] until a more thorough IIB investigation could be completed. [Commissioner] Erwin said that if [GC] Kerr was unable to do so, then [Commissioner] Erwin would go to the Attorney General or the Governor's office." Four days later, on February 8, Commissioner Erwin received a letter of termination signed by Secretary Tilley. The letter stated that Commissioner Erwin was being terminated without cause.[11]

---

[9] According to his deposition, Brad Holajter was budget director, then promoted to Executive Director of Administrative and Management Services.

[10] GC English resigned on or around January 15.

[11] The termination letter dated February 8, 2019, states in part, "[t]his action is being taken without cause, therefore you do not have the right to appeal this action to the Kentucky Personnel Board. However, [Kentucky Revised Statute] KRS 18A.095 provides that you may file a claim of discrimination with the Kentucky Personnel Board if you believe the action was based on unlawful discrimination. In accordance with KRS 18A.095, any claim of discrimination must be filed within thirty (30) days, excluding the date notification is sent."

Commissioner Erwin contends he was fired in violation of (1) the KWA (KRS 61.102 and 61.103) following his two disclosures of suspected mismanagement, waste, and/or abuse of authority, and (2) the KCRA (KRS Chapter 344 *et seq.*) by firing him "without cause"[12] after Commissioner Erwin opposed the termination of two African American DOC employees.

Less than two weeks after his termination, Erwin filed suit against the Cabinet. After the failure of court-ordered mediation, the matter was set for trial. Prior to that trial date, the Cabinet filed a motion for summary judgment. This motion was granted, dismissing all of Commissioner Erwin's claims. This appeal followed. Additional facts will be included below as necessary.

## III. STANDARD OF REVIEW

Summary judgment is properly granted where "the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR[13] 56.03. Upon our review, we must consider whether the trial court correctly determined that there were no genuine issues of material fact concerning

---

[12] The Cabinet later detailed reasons why Commissioner Erwin was, in fact, terminated *for cause*. Under these circumstances, that distinction – for cause or without cause – is not critical to our review.

[13] Kentucky Rule of Civil Procedure.

Commissioner Erwin's whistleblower and civil rights claims and properly

concluded that the Cabinet was entitled to judgment as a matter of law. *See Scifres*

*v. Kraft*, 916 S.W.2d 779 (Ky. App. 1996).

> Additionally,

> [S]ummary judgment is designed to expedite the disposition of a case when it is clear that a trial is unnecessary, i.e., that a rational trier of fact could not return a verdict for the non-moving party. [*Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky. 1991)]. . . .

> Determination that a fact is material or immaterial rests on the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). But as CR 56.03 reflects, the inquiry is not simply whether an issue of material fact exists but what facts the parties are able to prove. *See Steelvest*, 807 S.W.2d at 483; *Barton v. Gas Serv. Co.*, 423 S.W.2d 902, 905 (Ky. 1968) . . . .

> The party moving for judgment bears the burden of establishing the apparent non-existence of a genuine issue of material fact. *Barton*, 423 S.W.2d at 905. The burden then shifts, and the party opposing summary judgment is obligated to present at least some affirmative evidence to show that a material issue of fact exists for a jury to consider. *Steelvest*, 807 S.W.2d at 482.

*Kearney v. University of Kentucky*, 638 S.W.3d 385, 397 (Ky. 2022).[14]

---

[14] *Kearney* was published on January 20, 2022, *after* Commissioner Erwin (November 12, 2021) and the Cabinet (January 11, 2021) filed their initial briefs with this Court, but *before* oral arguments (July 19, 2022).

It is important to note that, under the summary judgment standard, "[a] party's subjective beliefs about the nature of the evidence [are] not the sort of affirmative proof required to avoid summary judgment." *Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. App. 2007) (citing *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990)). "The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." *Wymer v. JH Properties*, *Inc.*, 50 S.W.3d 195, 199 (Ky. 2001) (citing *Harker v. Federal Land Bank of Louisville*, 679 S.W.2d 226 (Ky. 1984)). Consequently, at the trial court level, the Cabinet bore the burden of establishing the apparent non-existence of a genuine issue of material fact. However, on appeal, Commissioner Erwin now bears the burden of presenting *significant evidence* to show that a material issue of fact exists for a jury to consider. *Id*.

Because summary judgment in this case involves only questions of law and not the resolution of disputed material facts, we do not defer to the trial court's decision. *Goldsmith v. Allied Building Components*, *Inc.*, 833 S.W.2d 378 (Ky. 1992). Instead, we review the trial court's interpretations of law *de novo*. *Cumberland Valley Contrs.*, *Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644 (Ky. 2007).

## IV. ANALYSIS

Ordinarily, a Kentucky employer may discharge an at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible. *Wymer*, 50 S.W.3d at 198 (Ky. 2001) (citing (generally) *Production Oil Co. v. Johnson*, 313 S.W.2d 411 (Ky. 1958) and *Scroghan v. Kraftco Corp.*, 551 S.W.2d 811 (Ky. App. 1977)). However, there are limitations on the at-will doctrine to protect employees from a discharge that is contrary to public policy and/or in conflict with constitutional or statutory provisions. *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985). Here, we must determine if Commissioner Erwin can prove that his rights – under the Kentucky Whistleblower Act and the Kentucky Civil Rights Act – have been violated by the Cabinet.

### A. Kentucky Whistleblower Act

The KWA is an anti-retaliation statute that "serves the remedial purpose of protecting employees who possess knowledge of wrongdoing that is concealed or not publicly known and who step forward to help uncover and disclose information." *N. Kentucky Area Dev. Dist. v. Wilson*, 612 S.W.3d 916, 920 (Ky. 2020) (internal quotation marks and citations omitted). To set forth a claim for retaliation under the KWA, a claimant must establish the following:

> (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to

an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure.

*Davidson v. Com.*, *Dep't of Military Affairs*, 152 S.W.3d 247, 251 (Ky. App. 2004). Additionally, a claimant must prove "by a preponderance of evidence that the disclosure was a contributing factor in the personnel action." KRS 61.103(3).

There is no question in this case that Commissioner Erwin qualifies as an "employee" and that the Cabinet is an "employer" under the statute. Therefore, to prevail on a KWA claim, Commissioner Erwin must prove that 1) he made a good faith disclosure of facts or information relative to actual or suspected mismanagement, waste, fraud and/or abuse of authority 2) to an appropriate body or authority, and 3) that the disclosure was a contributing factor in the Cabinet terminating his employment. *See* KRS 61.103(3). *See also Kearney*, 638 S.W.3d at 389-99, and *Woodward v. Commonwealth*, 984 S.W.2d 477, 480-81 (Ky. 1998). Here, Commissioner Erwin argues that he made **two such disclosures**: (a) one disclosure in 2017 about GC English and the KCI, and (b) another in 2019 regarding the IIB investigation.

### i.    KWA:  KCI Disclosure

To begin with, the trial court determined that Commissioner Erwin's **first disclosure**, the 2017 KCI disclosure to Secretary Tilley and Deputy Grate qualified, under KWA, was a disclosure of waste and/or abuse of authority to the

proper authority, but that the disclosure was not a "contributing factor" in his termination because of the intervening time and his promotion. To the contrary, Commissioner Erwin argues that a reasonable jury could find the KCI disclosure played a role in his termination, but he does not present significant evidence to support that contention.

In support of his argument, Commissioner Erwin points to *Harper v. University of Louisville*, 559 S.W.3d 796 (Ky. 2018), a Kentucky Supreme Court's decision that reversed this Court. In *Harper*, she (Harper) brought a wrongful termination action under KWA; a jury agreed that her job was eliminated in retaliation for her numerous complaints to the University of Louisville officials about suspected wasteful spending; she was awarded approximately $226,409 in back pay, $201,000 for mental anguish, $131,362 in attorney fees, and $1,996.19 in court costs. *Id.* at 800-01. This Court reversed, concluding that none of Harper's seven alleged incidents qualified as a protected disclosure under the statute. *Id*. at 803. The Supreme Court reinstated the jury verdict concluding, in part, that at least three of Harper's seven incidents qualified as protected disclosures under KWA. *Id*. The Supreme Court in *Harper* described the causation element in broad terms.

> The causation element of a KWA claim is satisfied if the
> jury believes that a qualifying disclosure was merely a
> "contributing factor" in the adverse employment
> decision, meaning that causation is established if the

-12-

disclosure, *in any way*, alone or in combination with other factors, advanced the adverse employment decision. KRS 61.103(l)(b) creates a presumption that an adverse employment action following in reasonably close temporal proximity to a protected discourse was caused by the disclosure: "It shall be presumed there existed a 'contributing factor' if the official taking the action knew or had constructive knowledge of the disclosure and acted within a limited period of time so that a reasonable person would conclude the disclosure was a factor in the personnel action."

*Harper*, 559 S.W.3d at 804.

To reiterate, the disclosure must have led to his termination within a "*reasonably close temporal proximity.*" *Harper*, 559 S.W.3d at 804 (citing KRS 61.103(1)(b)). In *Harper*, the elimination of her position was announced "immediately upon the heels of her last wasteful spending disclosure[.]"[15] *Id.* at 804. In contrast to *Harper*, Commissioner Erwin's termination occurred approximately 18 months[16] after his KCI disclosure.

"Because the federal and Kentucky whistleblower legislation is similar, we have routinely looked to the federal courts' interpretation of the corresponding federal whistleblower statute as persuasive authority." *Id.* at 802 (citations omitted). However, we do not find Commissioner Erwin's federal

---

[15] On November 30, 2010, *five days* before she was given notice of her termination, Harper made a complaint about wasteful spending to a budget supervisor. *Id.* at 807.

[16] At oral arguments, Commissioner Erwin argued his termination was *nine months* after the conclusion of the investigation that resulted from his disclosure, but under these circumstances, this distinction – 18 months or nine months – does not materially alter the analysis.

-13-

references – to the Merit Systems Protection Board – to be persuasive.  True, each of his references found one to two years' time between the disclosure and the adverse employment action to meet the required causal connection;[17] but, those cases are factually much stronger than the matter before us.

In *Rumsey v. Department of Justice*, 120 M.S.P.R. 259 (M.S.P.B. 2013), Rumsey alleged her employer gave her improperly low performance ratings, moved some of her job duties to other employees, canceled her telework agreement, and prohibited her from making site visits.  *Id.* at ¶ 4.  This evidence showed an alleged *consistent pattern* of negative treatment *linking* the disclosure and the adverse employment.

In *Gonzalez v. Department of Transportation*, 109 M.S.P.R. 250 (M.S.P.B. 2008), Gonzalez testified – in front of the Office of the Inspector General – that Lynda Holst possessed a fake identification badge; just over one year later, Holst was his supervisor at the time of his removal.  *Id*. at ¶ 17-19.  Gonzalez clearly had a strong argument of retaliation.

---

[17] Federal courts and agencies refer to this as the knowledge/timing test.  "In a 1994 amendment to the WPA, Congress established a knowledge/timing test that allows an employee to demonstrate that the disclosure was a contributing factor in the personnel action through circumstantial evidence, such as evidence that the official taking the personnel action 'knew of the disclosure,' and that the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor."  *Swanson v. Gen. Servs. Admin.*, No. DA-1221-08-0182-W-1, 2008 WL 5104244 (M.S.P.B. Dec. 4, 2008) (citing 5 United States Code ("U.S.C.") § 1221(e)(1)).

In *Schnell v. Department of the Army*, 114 M.S.P.R. 83 (M.S.P.B. 2010), Schnell wrote a Quality Assurance Surveillance Plan ("QASP") that disclosed problems with the inspection process at various federal agencies. *Id.* at ¶ 4. Schnell alleged that his employer had curtailed his job responsibilities, denied him a temporary promotion, and threatened to separate him in reprisal for his disclosures. *Id.* at ¶ 5. Once again, a more *consistent pattern* of alleged adverse treatment, *i.e.* a stronger factual argument, than the one presented by Commissioner Erwin.

Here, we do not find 18 months to be such "a limited period of time[,]" without any other events, words, or actions linking the disclosure with the termination. Commissioner Erwin alleged that after the KCI disclosure, he had a contentious relationship with GC English, but he points to only one meeting, almost 17 months later, where that hostility manifested. Besides that contentious relationship, Commissioner Erwin did not present any evidence that his responsibilities or authority were negatively affected. He did not present any evidence of resulting discipline or specific examples of hostility from Secretary Tilley or Deputy Grate. He was not demoted or reprimanded in the months following the disclosure. In fact, he was *promoted* from Acting Commissioner to Commissioner during that time.

As to the timing of the termination – specifically as it relates to GC English – we agree with the trial court's summary.

> It is uncontroverted by [Commissioner Erwin] that [GC] English resigned on January 15, 2019, three weeks before [Commissioner Erwin] was terminated. In addition, Secretary Tilley testified he did not make the decision to terminate [Commissioner Erwin] until after [he] met with [Commissioner Erwin] in late January. And though [Secretary] Tilley acknowledges [GC] English supported his decision to terminate [Commissioner Erwin], [Secretary] Tilley also stated it was ultimately his decision and was supported by everyone who knew the surrounding circumstances.

Further, although Commissioner Erwin is correct that an employer must establish – by clear and convincing evidence – that the disclosure was not a material fact in the personnel action, that shift of burden only comes into play *after* an employee presents evidence that the disclosure was a contributing factor in the personnel action against him. *Davidson*, 152 S.W.3d at 251 (internal quotation marks and citations omitted) ("The employee must show by a preponderance of evidence that the disclosure was a contributing factor in the personnel action. The burden of proof is then on the state employer to prove by clear and convincing evidence that the disclosure was not a material fact in the personnel action."). Here, no shift of burden is appropriate because Commissioner Erwin did not submit the required evidence to show that the KCI disclosure was a contributing

-16-

factor in his termination. Therefore, the KCI disclosure cannot sustain Commissioner Erwin's KWA claim.

### ii. KWA: IIB Disclosure

Next, Commissioner Erwin argues that his **second disclosure** about the insufficiency of the IIB investigation is protected under KWA. Commissioner Erwin's IIB disclosure argument has evolved through the course of this legal proceeding, and despite preservation concerns, we acknowledge both versions of his argument. At the trial level, Commissioner Erwin addressed the matter as if Secretary Tilley was the "wrongdoer," but on appeal he claims the "wrongdoers" were the IIB investigators. As will become apparent, we need not concern ourselves with this discrepancy.

In his original complaint, filed February 21, 2019, Commissioner Erwin states, in part,

> 8. In January 2019, [Commissioner Erwin] found on at least two occasions that the IIB's work product was deficient and that its promulgated Memos of Concern, which are its investigation findings, contained inaccuracies and failed to gather considerable, readily available information through witnesses and documentation.
>
> 9. [Commissioner Erwin] voiced his concerns to the [Cabinet] that he believed the IIB was mismanaged.
>
> 10. The [Cabinet], through its agents, apparent agents, servants, borrowed servants and employees . . . directed

-17-

[Commissioner Erwin] to refrain from making any documented disagreements about the IIB's reports.

11. In a meeting in January 2019 the [Cabinet] . . . directed [Commissioner Erwin] to terminate the employment of two African-American Department of Corrections employees based on IIB investigations.

12. [Commissioner Erwin] reiterated his concerns to the [Cabinet] about the deficient work product of the IIB and in particular the corresponding investigations of these two employees, and that terminating these employees based on theses deficient investigations would deprive these employees of due process, would constitute mismanagement of the matters and would be an abuse of his, the Department of Corrections and the [Cabinet's] authority.

. . . .

18. [Commissioner Erwin] told [Secretary Tilley] that [terminating the employees] is not proper management of the situation, that such a plan of action is mismanagement of the situation, is wasteful, deprives the two employees of due process, and would be an abuse of both the Commissioner's and the Secretary's authority.

The trial court understood – from that complaint and more than two years' litigation – that the "wrongdoers" were the Cabinet leadership, specifically Secretary Tilley. The trial court found that Commissioner Erwin's alleged IIB disclosures did not constitute a disclosure under KWA because 1) the statements are not of the kind protected, *i.e.* they did not relay information violative of state law or regulation, nor information objectively viewed as waste or fraud, and 2) the

statements were made to the wrongdoer about the wrongdoer's own conduct, which is not protected under KWA. The trial court determined:

> Here there is no allegation of misconduct, malfeasance, or abuse of public funds. It is a simple disagreement over a personnel decision and "disagreement with supervisors over job-related activities are commonplace and do not constitute whistleblowing." *Moss*, 465 S.W.3d at 459.[18]
>
>  . . .
>
> Reporting mismanagement or suspected wasteful spending to the alleged offender does not expose any waste or mismanagement, and without further disclosures, it is unlikely to achieve the objective of the KWA. Thus, [Commissioner Erwin's] expressing his belief that firing the two corrections officers would be violative of applicable law, this statement made to Secretary Tilley, the supposed wrongdoer, is not a sufficient disclosure[.]

We see no reason to disagree with the trial court's reasoning or conclusions, but we must address one aspect: the *nature of the information* protected under KWA. "[T]he nature of the information disclosed cannot simply be an expression of a policy disagreement based upon the whistleblower's subjective opinion; it must objectively meet the criteria for the kinds of misconduct described in the KWA, such as actual or suspected conduct that violates a law or administrative regulation or conduct that objectively viewed constitutes waste or

---

[18] *Moss v. Kentucky State University*, 465 S.W.3d 457, 460 (Ky. App. 2014) (citing *Willis v. Dep't of Agric.*, 141 F.3d 1139, 1143 (Fed. Cir. 1998)).

-19-

fraud." *Harper*, 559 S.W.3d at 803 (citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)) ("[T]he proper test is this: could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee reasonably conclude that the actions of the government evidence gross mismanagement? A purely subjective perspective of an employee is not sufficient even if shared by other employees."). This objective standard referenced in *Harper* is consistent with the text of KRS 61.102(1): "No employer shall subject to reprisal . . . any employee who in good faith reports . . . any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority."

> Further,
>
> In *Harper*, a jury agreed that Harper's job was eliminated in retaliation for her numerous complaints to University of Louisville (UofL) officials about suspected wasteful spending. [*Harper*, 559 S.W.3d] at 800. One disclosure at issue involved UofL's spending on a commercial. *Id.* at 805. In keeping with her knowledge and experience, Harper reported a concern that an advertising agency's quote of $100,000 for the commercial was too high and out of line with industry norms for that type of project and provided a recent comparison of $50,000 being spent on a similar commercial. *Id.* Harper expressed concern that an overpayment of that magnitude would waste taxpayer dollars, especially when UofL's programs were being cut back because of budget constraints. *Id.* This Court . . . concluded that Harper's disclosure, while perhaps an opinion, was objectively based and that information was relayed to an appropriate UofL official; consequently KRS 61.102's disclosure requirements were met. *Id.* at 806-07.

*Kearney*, 638 S.W.3d at 405.

Here, unlike in *Harper*, Commissioner Erwin relayed no objective fact or information supporting the suggestion of misconduct by stating that the IIB investigation and memos of concern were "deficient." Stated differently, Commissioner Erwin did not identify or report certain Cabinet actions upon which it was clear he was blowing the whistle; this applies regardless of whom Commissioner Erwin perceives as the "wrongdoer," Secretary Tilley or the IIB investigators. To say the IIB investigators did a poor job on the investigation is not an accusation of mismanagement, waste, fraud, or abuse of authority. To say Secretary Tilley erred by disagreeing with Commissioner Erwin as to whether the IIB investigation was sufficient to fire the DOC employees is not an accusation of mismanagement, waste, fraud, or abuse of authority. No matter who wears the crown of "wrongdoer," Commissioner Erwin's 2019 IIB disclosure was not of the nature protected by the KWA. Therefore, Commissioner Erwin's IIB allegations are not protected disclosures under KRS 61.102.

## B. Kentucky Civil Rights Act

The trial court found that Commissioner Erwin did not present sufficient evidence of the Cabinet's intent to discriminate, nor did Commissioner Erwin show proof that he was terminated in violation of KCRA. On appeal, Commissioner Erwin argues that the trial court did not view the facts in a light most favorable to him. He argues that he has a "straightforward claim of

-21-

retaliation."  Commissioner Erwin contends that several individuals at the Cabinet, and the Cabinet as a whole, conspired to terminate his employment for opposing the possible DOC officers' terminations.

The KRCA makes it unlawful for a person, or two or more people, to conspire:

> (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by [KRS Chapter 344], or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under [KRS Chapter 344.]

KRS 344.280.  A *prima facie* retaliation case under KRS 344.280 requires the plaintiff to have engaged in a "protected activity" and to show a causal nexus between the activity and the employer's adverse employment action.  *Louisville & Jefferson Cty. Metro. Sewer Dist. v. Hill*, 607 S.W.3d 549, 557 (Ky. 2020) (citing *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 583 (Ky. 2016)).  Here, the record reflects that Commissioner Erwin failed to meet this burden of production.

Commissioner Erwin contends he voiced his racial concerns to the Cabinet Executive Staff during meetings on January 14, January 28, and February 4, 2019.  However, from the record, it appears that Commissioner Erwin merely pointed out the racial discrepancy – the investigator was white and the DOC officers were African American – but did not argue that a racial *bias* existed.  During his deposition testimony, Commissioner Erwin stated that he "had concerns

-22-

taking that action [of firing the DOC officers] against minority employees because of the different avenues of redress that they would have." Referring to a meeting with Cabinet members, be quoted himself as saying:

> You do realize that these are two minority employees that we're talking about and that to [fire them] with a deficient report is going to not only open us up to, you know, a weak case for the personnel board, but there's also civil remedies that they would – they could take advantage of.

The record does not reflect that he put the Cabinet on notice that he believed the firing recommendations were *because* of race. He did not make a complaint concerning race to the Cabinet; he did not complain to any specific Cabinet member stating his belief that the firings were racially motivated; nor did he offer any evidence that the Cabinet was aware that he had concerns about the IIB investigator's possible racial bias.[19] In fact, he did not make mention of the KCRA violation until his amended complaint, almost a year after he filed his original complaint. Because Commissioner Erwin was unable to show that he engaged in a protected activity and was unable to make a *prima facie* case of retaliation, the trial court properly granted summary judgment to the Cabinet on this claim.

---

[19] Commissioner Erwin showed no evidence to support a good faith belief that the Cabinet was suggesting termination due to the DOC officers' race. As a member of Kentucky DOC management since 2007, Commissioner Erwin would have been in a position to know of and present evidence of racial discrimination in the DOC but presented none.

-23-

# V. CONCLUSION

For the foregoing reasons, we AFFIRM the Oldham Circuit Court as to the dismissal of Commissioner Erwin's KWA and KCRA claims. As a result, there is no need to address the issue of emotional distress damages.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Kevin C. Burke<br>Jamie K. Neal<br>Louisville, Kentucky | Robyn Bender<br>Leah Cooper Boggs<br>Frankfort, Kentucky |
| Thomas R. Coffey<br>Louisville, Kentucky | Joshua Newton<br>Benjamin Siegel<br>Frankfort, Kentucky |
| ORAL ARGUMENT FOR APPELLANT: | ORAL ARGUMENT FOR APPELLEE: |
| Thomas R. Coffey<br>Louisville, Kentucky | Leah Cooper Boggs<br>Frankfort, Kentucky |
| | Joshua Newton<br>Frankfort, Kentucky |